UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICE AMERSON,

                Plaintiff,            Civil Action No. 12-14395
                                            Honorable Paul D. Borman
                                            Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [15, 19]

Plaintiff Patrice Amerson ("Amerson") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [15, 19], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.**      **RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Amerson is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [19] be DENIED, Amerson's Motion for Summary Judgment [15] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED to

the ALJ for further proceedings consistent with this Recommendation.

## II.   REPORT

### A.      Procedural History

On March 31, 2009, Amerson filed applications for SSI and DIB, alleging a disability onset date of June 30, 2004.[1]   (Tr. 181-86).   These applications were denied initially on September 2, 2009.  (Tr. 128-35).  Amerson filed a timely request for an administrative hearing, which was held on August 12, 2010, before ALJ Paul Armstrong.  (Tr. 34-83).  Amerson, who was represented by attorney Allan Ben, testified at the hearing, as did her sister, Keisha McFadden, and vocational expert Linda Gels.  (*Id.*).  On September 15, 2010, the ALJ issued a written decision finding that Amerson is not disabled.  (Tr. 100-13).  On August 17, 2012, the Appeals Council denied review.   (Tr. 2-4).   Amerson filed for judicial review of the final decision on October 4, 2012.  (Doc. #1).

### B.      Background

#### 1.    *Disability Reports*

In an April 1, 2009 disability field office report, Amerson reported that her alleged onset date was June 30, 2004.  (Tr. 215).  The claims examiner noted that, during a face-to-face interview, Amerson had trouble standing and walking, and "moaned and groaned a lot" due to back pain.  (Tr. 217).

In an undated disability report, Amerson indicated that her ability to work is limited by back and leg pain, arthritis, and seizures.  (Tr. 220).  Amerson reported that her conditions first interfered with her ability to work in 2004 and, since that time, she has only been able to work on

---

[1] Amerson previously applied for DIB and SSI on January 31, 2006, alleging the same disability onset date of June 30, 2004.  (Tr. 87).  On May 27, 2008, ALJ Melvyn Kalt issued a written decision concluding that Amerson was not disabled.  (Tr. 87-90).

a part-time basis. (*Id.*). At the time of the report, Amerson was working twenty hours per week as a teacher's assistant. (Tr. 221). Prior to that, she worked as a school secretary and as a retail assistant manager. (*Id.*). She indicated that she had treated with several providers regarding her physical impairments and was taking several different medications. (Tr. 223-25).

In a function report dated April 15, 2009, Amerson reported that she lived in a house with family. (Tr. 237). When asked to describe her daily activities, Amerson indicated that she takes her medication, goes to work (which sometimes causes severe pain), and then takes care of her children. (*Id.*). When asked to describe what she could do before the onset of her conditions that she can no longer do, Amerson indicated: "everything." (Tr. 238). She has difficulty sleeping and getting into and out of the bathtub, and she needs reminders to take her medication. (Tr. 238-39). Amerson prepares her own meals on a daily basis but does "very little" housework or yard work. (Tr. 239-40). She goes outside four or five times per week and is able to drive a car and use public transportation. (Tr. 240). She goes shopping for food and personal items, and is able to pay bills, use a checkbook, and handle a checking and savings account. (*Id.*). She does not have any hobbies because she is too "stressed and pained" to focus. (Tr. 241). She does not spend time with others, does not go anywhere on a regular basis, and has difficulty getting along with others. (Tr. 241-42).

When asked to identify functions impacted by her conditions, Amerson checked lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, using her hands, and getting along with others. (Tr. 242). She can lift up to ten pounds. (*Id.*). She has difficulty following written instructions (she "can't focus" and gets a headache) but can follow spoken instructions. (*Id.*). Amerson gets along well with authority figures but does not handle stress well. (Tr. 243). She indicated that she had been

3

prescribed a cane, but her therapist had also given her a walker, which she was using.  (*Id.*).

In an October 6, 2009 disability appeals report, Amerson reported that, since May 2009, she had been experiencing more pain and headaches, as well as seizures, which prevented her from continuing to work.  (Tr. 252).  In addition, she had begun suffering from depression.  (*Id.*).

### 2.    *Amerson's Testimony*

At the time of the August 12, 2010 hearing before the ALJ, Amerson was 42 years old. (Tr. 215).  Because Amerson suffers from a seizure disorder and has difficulty with short-term memory, her sister, Keisha McFadden, also testified as a witness at the hearing.  (Tr. 34-83).

Amerson testified that she began experiencing seizures approximately four or five years before the hearing, and she asserted that she last had a seizure just one week before the hearing. (Tr. 41, 43).  She does not remember having seizures, but after one occurs, she wakes up on the floor, her muscles ache badly, and she has difficulty moving for the rest of the day.  (Tr. 39-40). Ms. McFadden testified that she witnessed "four or five" seizures between early 2009 and the time of the hearing (in August 2010).  (Tr. 63).  She last witnessed a seizure approximately one month before the hearing; when a seizure occurs, Amerson starts shaking, and her head and eyes roll back.  (Tr. 39-40).  According to Ms. McFadden, Amerson does not need to seek medical treatment after every seizure, but her family members merely "make sure she's comfortable." (Tr. 43-44).  She takes Keppra and Tegretol for seizures.  (Tr. 50-51).  Amerson claims she stopped working as a teacher's assistant because she suffered a seizure at school and the school refused to let her return (for liability reasons).  (Tr. 45-46).

In addition, Amerson began to experience back pain after she gave birth to twins in 2004, and says it is "getting worse every day."  (Tr. 64).  She has used a cane or a walker since 2005 or 2006.  (Tr. 72).  At the time of the hearing, she weighed 290 pounds, could "hardly move," and

felt like she was "90 years old." (Tr. 66). In addition, she was taking medication and treating with a psychiatrist for depression. (Tr. 71).

Ms. McFadden further testified that, in the year preceding the hearing, Amerson's medical condition had deteriorated quickly and dramatically, to the point where she was "not able to do any walking," was "not able to sit down a long time," and "had several seizures constantly." (Tr. 45). For the past year, her family members (mother and sisters) had "to do everything for her," including caring for her children, cooking, and cleaning. (Tr. 67). Amerson testified, however, that she was able to drive when necessary. (Tr. 69-70).

### 3. Medical Evidence

In his decision, ALJ Armstrong found no reason to reopen ALJ Kalt's prior decision and, as a result, indicated that he would "only examine evidence starting on May 28, 2008, the day after the last decision was issued." (Tr. 100). This Court too will focus primarily on medical evidence post-dating ALJ Kalt's decision.

#### (a) Treating Sources

On February 14, 2008, Amerson presented to her treating neurologist, Dr. Bharat Tolia, complaining of lower back, neck, and leg pain, as well as "troubles" with her short term memory. (Tr. 269). Dr. Tolia diagnosed chronic cervical and lumbosacral pain, carpal tunnel syndrome, and degenerative disc disease, and indicated a desire to "[r]ule out intracranial lesion, seizures and MS Secondary to Dilaudid." (*Id.*). Two weeks later, on February 28, 2008, Amerson returned to see Dr. Tolia, again complaining of pain and problems with short-term memory (she was "forgetting spelling and things she was supposed to do"). (Tr. 267). On examination, however, all of Amerson's neurologic functions were normal. (Tr. 268).

On March 7, 2008, Amerson underwent an MRI of her lumbar spine, which revealed no

intervertebral disc herniation, spinal stenosis, or neuroforaminal encroachment; however, L4-L5 and L5-S1 showed bilateral facet joint degenerative changes.  (Tr. 264).  On April 29, 2008, Amerson returned to see Dr. Tolia, reporting that her low back pain had increased since her last visit.  (Tr. 265).  She was working 20 hours per week, which was "very draining," and increased her pain.  (*Id.*).  On mental status examination, she was awake, alert, and oriented; her attention, recall, speech, and language function were all normal; and she had normal neurologic functions.  (Tr. 266).  Amerson next saw Dr. Tolia on May 27, 2008, reporting continuing problems with sleep, memory, and pain.  (Tr. 273).  Again, however, Amerson's mental status and neurologic function examinations were normal.  (Tr. 274).

When Amerson next saw Dr. Tolia, on June 4, 2008, she again reported worsening back pain, stating that she lost feeling in her right leg and "slid forward."  (Tr. 271).  Amerson's examination was "unremarkable," however.  (Tr. 272).  That same day, Dr. Tolia issued a disability certificate, in which he indicated that Amerson "cannot work due to seizures and chronic cervical pain."  (Tr. 330).

At a visit to Dr. Preston Thomas on August 12, 2008, Amerson continued to complain of low back pain and also indicated that she was being treated for a seizure disorder.  (Tr. 279).  Her blood pressure was 136/100.  (*Id.*).  A November 10, 2008 echocardiogram revealed mild regurgitation in all four valves with mild to moderate levels of tricuspid valve regurgitation.  (Tr. 283).  At follow-up visits to Dr. Thomas on November 13, 2008 and December 12, 2008, Amerson's blood pressure was 150/100, and she had complaints of bladder incontinence.  (Tr. 277-78).  Amerson's next treatment was on April 6, 2009, when she saw Dr. Thomas with complaints of right leg pain and "feeling overwhelmed."  (Tr. 275).  Her blood pressure was still elevated at 150/100, and she was diagnosed with hypertension, arthralgias, and anxiety.  (*Id.*).  In

a letter dated September 1, 2009, Dr. Thomas opined that Amerson was "disabled and unable to work due to her seizure disorder." (Tr. 329).

From September 2009 through July 2010, Amerson treated with two physicians, Dr. Tolia and Dr. Robert Philips. On September 17, 2009, Amerson underwent an EEG with Dr. Tolia, which was abnormal for subcortical midline disturbance. (Tr. 331). An EMG study of Amerson's lower extremities performed the same day was abnormal for right L5-S1 radiculopathy. (Tr. 332). She also underwent a nerve conduction study, which showed axonal damage to the sensory nerves bilaterally. (Tr. 335). Amerson returned to see Dr. Tolia on October 6, 2009, with complaints of pain running down both legs. (Tr. 355). She was having spasms in her legs and they sometimes felt numb, but she said she had not had any seizures since her last visit. (*Id.*). At Amerson's next visit to Dr. Tolia, on December 17, 2009, her back pain was worse; in addition, she indicated that she was forgetting more things and having trouble finding words, but she said she still had experienced no seizures. (Tr. 353). On January 14, 2010, she still complained of back and neck pain, but claimed she had not experienced a seizure in four months. (Tr. 350). And, on February 11, 2010, she complained that her pain was constant, but she was satisfied with her medications and said she had not experienced a seizure in five months.[2] (Tr. 347).

Amerson saw Dr. Philips on February 25, 2010, with complaints of low back pain. (Tr. 369). On examination, her blood pressure was 140/98, and she had antalgic gait, but was otherwise normal. (Tr. 370). She was diagnosed with hypertension, obesity, and seizure disorder. (*Id.*). Amerson returned to see Dr. Tolia on March 11, 2010, complaining of constant pain, headaches, and blurred vision. (Tr. 345). She reported that, the week before, her left eye

---

[2] According to Ms. McFadden, Amerson's statements regarding her lack of seizure activity are not necessarily accurate because she cannot remember having seizures. (Tr. 59-60).

had started twitching; her face, neck, and leg became stiff; and she believed she had experienced a seizure. (*Id.*). On March 23, 2010, she complained of back pain, leg pain, headaches, trouble breathing, and eye twitching. (Tr. 341). At her next visit to Dr. Tolia, on April 20, 2010, she reported continued eye twitches. (Tr. 338). On May 5, 2010, Dr. Tolia issued another disability certificate, indicating that Amerson was disabled and "unable to work" because of low back pain, neck pain, leg pain, headaches, seizures, and short term memory impairment. (Tr. 336). Dr. Tolia's notes from May 19, 2010, indicate a desire to have her evaluated for home care "to coordinate all care." (Tr. 337).

Amerson saw Dr. Philips on May 3, 2010, complaining of heart pressure. (Tr. 365). On physical examination, her blood pressure was 140/98, but she was otherwise normal. (Tr. 366). On June 7, 2010, she complained to Dr. Philips of right leg and arm pain and tingling. (Tr. 363). On physical examination, her blood pressure was 142/100, and she had an antalgic gait. (Tr. 364). A chest x-ray revealed no acute pulmonary process. (Tr. 371-72). At her next visit to Dr. Philips, on July 8, 2010, her neuropathy in her arms and legs was worse. (Tr. 360). On examination, her blood pressure was 140/90, but her examination was otherwise normal. (Tr. 361). On July 13, 2010, she came in to see Dr. Philips to have disability paperwork completed. (Tr. 358). Her blood pressure was 130/92, and she was diagnosed with hypertension, seizure disorder, and chronic low back pain. (Tr. 359). On August 10, 2010, Dr. Tolia completed a physical residual functional capacity questionnaire, indicating that Amerson was disabled as a result of her impairments. (Tr. 406-10).

Amerson also presented to Oakland Family Services on May 24, 2010, to begin treatment for her mental symptoms. (Tr. 377-93). She reported anxiety, panic attacks, grief, and difficulty adjusting to life changes. (Tr. 377). On mental status examination, she was oriented with an

appropriate affect.  (Tr. 381).  She had anxious behavior, but normal thought content, an organized thought flow, good memory and concentration, and appropriate judgment.  (Tr. 382).  She was diagnosed with adjustment disorder with anxiety and assessed a Global Assessment of Functioning (GAF)[3] score of 55.  (Tr. 392-93).  Amerson continued therapy sessions through July 20, 2010.  (Tr. 400).

### (b)    *Consultative and Non-Examining Sources*

On June 12, 2009, Amerson underwent a consultative physical examination with Dr. Cynthia Shelby-Lane.  (Tr. 287-95).  She reported being disabled due to back and leg pain, arthritis, and seizures; however, Dr. Shelby-Lane noted that Amerson had not had any follow-up or evaluation for her alleged seizure disorder and was not taking any medication for seizures.  (Tr. 287).  Amerson reported that she had had one seizure in 2007 and "possibly three in the past year."  (Tr. 288).  On physical examination, she was alert, oriented, and in no acute distress.  (*Id.*).  Her blood pressure was 174/105, and she had a slight limp on the right side, but she did not use a cane or other walking aid.  (Tr. 289).  She was able to tandem walk and heel/toe walk without difficulty; squat to 40%; bend to 50% and recover; her gross and fine dexterity were bilaterally intact; and her neurologic examination was normal.   (*Id.*).   Dr. Shelby-Lane's impression was chronic back pain due to L4-L5 and L5-S1 bilateral facet joint degenerative changes, a history of arthritis, and an alleged seizure disorder (although Dr. Shelby-Lane noted that Amerson "had records," she produced "no records regarding seizures noted on her previous exams").  (Tr. 289-90).  Dr. Shelby-Lane opined that Amerson should avoid repetitive lifting, pushing, pulling, and prolonged standing.  (Tr. 290).

---

[3]  GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

On July 7, 2009, a physical residual functional capacity ("RFC") assessment was conducted.  (Tr. 297-304).   Tricia Rogers, a state agency single decisionmaker, examined Amerson's medical records and concluded that she retained the ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for 2 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday (alternating between sitting and standing), and that she was not limited in the ability to push or pull.  (Tr. 298).   Rogers further concluded that Amerson could never climb ladders, ropes, or scaffolds; could only occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl; and must avoid all exposure to hazards.  (Tr. 299, 301).

On August 13, 2009, Amerson underwent a consultative psychological examination with Shelley Galasso Bonanno, a limited licensed psychologist.   (Tr. 305-11).   Amerson again reported that she was experiencing "more seizures than ever before," but offered no medical evidence in support of this assertion.  (Tr. 305).  She complained of depression and anxiety but denied any history of inpatient or outpatient psychiatric treatment.  (Tr. 306).  On mental status examination, Amerson's contact with reality was fair, but her self-esteem was poor and her insight was limited.  (Tr. 308).  She reported ongoing difficulties with short-term memory and was unable to identify her age.  (*Id.*).  She recalled only three digits forward and two backward and could name only two presidents and one famous person; moreover, she was unable to complete serial 7's or multiply.  (Tr. 309).  She was diagnosed with depressive disorder and anxiety disorder and assigned a GAF score of 48.  (Tr. 310).

On August 22, 2009, Rose Moten-Solomon, a state agency medical consultant, reviewed Amerson's records and completed a mental RFC assessment and a Psychiatric Review Technique.  (Tr. 313-28).  Ms. Moten-Solomon noted that Amerson suffers from an affective disorder (as defined in Listing 12.04) and an anxiety disorder (as defined in Listing 12.06).  (Tr.

319, 321).  She opined that Amerson is mildly limited in her activities of daily living and social

functioning, and moderately limited in maintaining concentration, persistence, and pace.[4]  (Tr.

326).  Ms. Moten-Solomon concluded that Amerson remained capable of unskilled work.  (Tr.

328).

### 4.    *Vocational Expert's Testimony*

Linda Gels testified as an independent vocational expert ("VE") at the administrative

hearing before the ALJ.  (Tr. 77-82).  The VE characterized Amerson's past relevant work as

ranging from semi-skilled to skilled in nature and performed at the light or sedentary exertional

level.  (Tr. 78-79).  Then, the ALJ asked the VE to imagine a claimant of Amerson's age,

education, and work experience, who could perform simple, unskilled, sedentary work, with the

following additional limitations:  no work at unprotected heights, around dangerous moving

machinery, or around open flames.  (Tr. 79).  The VE testified that the hypothetical individual

would not be capable of performing Amerson's past relevant work.  (*Id.*).  However, the VE

testified that the hypothetical individual would be capable of working in the "bench work"

positions of bench assembler or hand packager (2,500 jobs in the state of Michigan).  (*Id.*).

---

[4]  Specifically, in her RFC Assessment, Ms. Moten-Solomon opined that Amerson is not
significantly limited in the ability to remember locations and work-like procedures; understand,
remember, and carry out very short and simple instructions; perform activities within a schedule
and maintain regular attendance; sustain an ordinary routine without special supervision; work in
coordination with or proximity to others without being distracted by them; make simple work-
related decisions; complete a normal workday and work week without interruptions from
psychological symptoms; interact appropriately with the general public; ask simple questions or
request assistance; accept instructions and respond appropriately to criticism from supervisors;
get along with co-workers without distracting them; maintain socially appropriate behavior;
respond appropriately to changes in the work setting; be aware of normal hazards and take
appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic
goals and make plans independently of others.  (Tr. 313-14).  Ms. Moten-Solomon further opined
that Amerson is moderately limited in the ability to understand, remember, and carry out detailed
instructions, and maintain attention and concentration for extended periods.  (Tr. 313).

## C.  Framework for Disability Determinations

Under the Act, SSI and DIB are available only for those who have a "disability."  *See*

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant

part as the:

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to last
> for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be

determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful
> activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or
> combination of impairments that "significantly limits . . . physical or
> mental ability to do basic work activities," benefits are denied without
> further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity,
> has a severe impairment that is expected to last for at least twelve months,
> and the severe impairment meets or equals one of the impairments listed in
> the regulations, the claimant is conclusively presumed to be disabled
> regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work,
> benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past
> relevant work, if other work exists in the national economy that the
> claimant can perform, in view of his or her age, education, and work
> experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing

20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th

Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ….  If the

analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers

to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.      The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Amerson is not disabled under the Act.  At Step One, the ALJ found that Amerson has not engaged in substantial gainful activity since May 28, 2008, the day after ALJ Kalt issued his decision on her previous disability application.  (Tr. 102).  At Step Two, the ALJ found that Amerson has the severe impairments of degenerative disc disease, seizure disorder, hypertension, anxiety/depression, and obesity.  (Tr. 103).  At Step Three, the ALJ found that Amerson's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 103-05).

The ALJ then assessed Amerson's RFC, concluding that she is capable of performing unskilled sedentary work, except that she may not work at unprotected heights or around dangerous moving machinery.  (Tr. 105-11).  At Step Four, the ALJ determined that Amerson is unable to perform her past relevant work.  (Tr. 112).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Amerson is capable of performing a significant number of jobs in the national economy and, thus, she is not disabled under the Act.  (Tr. 112-13).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d

647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v.*

14

*Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

The ALJ considered Amerson's treatment for degenerative disc disease, seizure disorder, hypertension, anxiety, and depression and concluded that, despite these conditions, Amerson could perform a limited range of unskilled, sedentary work.  (Tr. 103-11).  In reaching this conclusion, the ALJ did not fully credit Amerson's allegations and gave no weight to the opinions of two of her treating physicians.  Amerson argues that the ALJ erred in these respects.

#### 1.    The ALJ's Credibility Determination is Not Supported by Substantial Evidence

As the Sixth Circuit has held, determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant is invaluable, and should not be discarded lightly."  *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (internal quotations omitted).  This Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [Amerson's alleged symptoms] are reasonable and supported by substantial evidence in the record."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

As an initial matter, Amerson points out that the ALJ indicated that because ALJ Kalt had issued a prior decision on May 27, 2008, he would "only examine evidence starting on May 28, 2008, the day after the last decision was issued."  (Tr. 100).  However, in discounting Amerson's allegations of disabling back pain, the ALJ relied on the results of a March 7, 2008 MRI of Amerson's lumbar spine, which revealed no evidence of disc herniation, spinal stenosis, or neuroforaminal encroachment.  (Tr. 106).  The Court agrees with Amerson that this was improper.[5]

---

[5] In response, the Commissioner asserts that, "Plaintiff does not show that the ALJ erred by only

More importantly, however, the reasons specifically identified by the ALJ for discounting Amerson's credibility are not supported by substantial evidence. For example, the ALJ noted that Amerson's blood pressure was not well-controlled, but then proceeded to state: "The record contains no evidence of medication compliance nor that she followed any recommended lifestyle changes to better control her blood pressure such as proper diet and exercise." (Tr. 108). The ALJ did not point to any evidence in the record suggesting that Amerson failed to comply with prescribed medication (or other recommendations regarding diet or exercise), yet he found her less than fully credible on this basis. And, as Amerson points out, there *is* no evidence in the medical records of medication non-compliance, nor is there any indication that Amerson's physicians had any concerns regarding her "compliance" with their recommendations and/or the taking of prescribed medications. (*See, e.g.,* Tr. 275, 277-79, 347-53, 365-70). Thus, the ALJ's determination that Amerson was less than fully credible because of a lack of "evidence of medication compliance" is not supported by substantial evidence.

It also appears that the ALJ discounted Amerson's credibility because he simply did not believe she was having seizures (or that her seizures seriously interfered with her activities of daily living). Although it is for the ALJ, and not the reviewing court, to evaluate the credibility of the claimant, "the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Burney v. Comm'r of Soc. Sec.*, 2013 WL 1289310, at *2 (E.D. Mich. Mar. 28, 2013) (quoting *Soc. Sec. Rul.* 96-7p, 1996 WL 374186, at *4 (July 2, 1996)). In this case, it appears that the ALJ made his credibility finding

---

examining evidence starting on May 28, 2008." (Doc. #19 at 11). This argument misses the mark. Amerson is not arguing that the ALJ should have considered evidence prior to May 28, 2008; rather, she argues that the ALJ said he would not consider such evidence and then proceeded to do so, drawing a negative inference against her from a credibility perspective in the process.

16

based on a "gut feeling" about Amerson's alleged seizure disorder.

For example, the ALJ concluded that, "While Dr. Philips diagnosed the claimant with seizure disorder, it appears he based his diagnoses on her own self-reports and not on any objective medical testing …." (Tr. 108). However, an EEG performed on September 17, 2009, was abnormal for subcortical midline disturbance. (Tr. 108, 331). Apparently, the ALJ does not consider this finding objective evidence of a seizure disorder. However, Amerson's treating neurologist, Dr. Tolia, characterized these EEG results as "abnormal" and proceeded to treat her with anti-seizure medications (including Tegretol and Topamax, at increasing doses). (Tr. 331, 350-51, 353-54). This at least suggests that Dr. Tolia believed, based on a review of the EEG results, that Amerson suffered from a seizure disorder. Thus, the ALJ's decision to discount Amerson's credibility because there was no "objective medical evidence" of a seizure disorder is not supported by substantial evidence. *See, e.g., Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 865 (6th Cir. 2011) ("In sum, while credibility determinations regarding subjective complaints rest with the ALJ, those determinations must be reasonable and supported by substantial evidence."); *Johnson v. Comm'r of Soc. Sec.*, 2013 WL 4669997, at *11 (E.D. Mich. Aug. 30, 2013) (remanding where the ALJ's credibility determination was not supported by substantial evidence).[6]

2.    *The ALJ Erred in Weighing the*
       *Opinions of Amerson's Treating Physicians*

Amerson also argues that the ALJ erred in giving no weight to the opinions of two of her

---

[6] In addition, the ALJ apparently discredited Amerson's allegations of disability, in part, because "the record [contained] no seizure activity log or any treatment outside of medication for any type of seizure activity." (Tr. 110). However, Ms. McFadden testified that Amerson is unable to remember having seizures (and, thus, presumably would have difficulty logging their existence) and that family members were told that she need not seek medical treatment after every seizure but, rather, should merely be made comfortable. (Tr. 43-44). Thus, these facts do not necessarily impugn Amerson's credibility, as the ALJ found.

17

treating physicians, Dr. Philips and Dr. Tolia.  (Doc. #15 at 25-31).  If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, "considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see also* 20 C.F.R. §416.927(c).  In addition, the treating source rule contains a procedural, explanatory requirement that an ALJ give "good reasons" for the weight given a treating source opinion. *See Wilson v. Comm'r of Soc. Sec.*, 2012 WL 6737766, at *8 (E.D. Mich. Nov. 19, 2012); *Soc. Sec. Rul.* 96-2p, 1996 WL 374188, at *5 (July 2, 1996) (providing that a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record").

In this case, the ALJ gave Dr. Philips' opinion no weight because, "While Dr. Philips diagnosed the claimant with seizure disorder, it appears he based his diagnoses on her own self-reports and not on any objective medical testing."  (Tr. 108).  Courts have cautioned that, in weighing the medical evidence, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'"  *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)). Accordingly, "an ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence."  *Id.* (internal quotations omitted); *see also Bledsoe v. Comm'r of Social Sec.*, 2011 WL 549861, at *7 (S.D. Ohio Feb. 8, 2011) ("An ALJ is not permitted to substitute her own medical judgment for

18

that of a treating physician and may not make her own independent medical findings."); *Mason v. Comm'r of Soc. Sec.*, 2008 WL 1733181, at *13 (S.D. Ohio Apr. 14, 2008) ("The ALJ must not substitute his own judgment for a doctor's conclusion without relying on other medical evidence or authority in the record.").  "In other words, '[w]hile an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions, the ALJ cannot substitute his [or her] own lay 'medical' opinion for that of a treating or examining doctor.'"  *Zaft v. Comm'r of Soc. Sec.*, 2013 WL 5340772, at *12 (Sept. 23, 2013) (quoting *Beck v. Comm'r of Soc. Sec.*, 2011 WL 3584468, at *14 (S.D. Ohio June 9, 2011)).

In this case, the ALJ rejected Dr. Philips' opinion because he purportedly "based his diagnoses [of seizure disorder] on [Amerson's] own self-reports and not on any objective medical testing."  (Tr. 108).  As set forth above, however, objective medical testing was conducted and revealed abnormalities:  specifically, Amerson's September 17, 2009 EEG was abnormal for subcortical midline disturbance.  (Tr. 331).  Despite this fact, and despite the fact that Amerson's treating physicians subsequently relied on these results in diagnosing her with and treating her for a seizure disorder, the ALJ appears to have substituted his own lay opinion for the medical opinions of Amerson's treating physicians and concluded that these EEG results were insufficient to substantiate Dr. Philips' opinion.  In doing so, the ALJ did not point to any "other medical evidence or authority in the record" suggesting that these test results did not establish the presence of ongoing seizure activity.  *Mason*, *supra* at *13.  By simply substituting his own medical judgment for that of Amerson's treating physician, the ALJ erred in giving no weight to Dr. Philips' opinions.

Amerson also argues that the ALJ erred in giving no weight to Dr. Tolia's opinions – issued in June 2008, May 2010, and August 2010 – that she was disabled as a result of her

impairments.  (Doc. #15 at 26-31).  In both his June 2008 and May 2010 disability certificates, Dr. Tolia simply opined that Amerson was disabled because of seizures, chronic cervical pain, and other conditions, without providing any supporting objective medical evidence.  (Tr. 330, 336).  In rejecting those two opinions, the ALJ explained that the question of whether an individual is disabled under the Act is an issue reserved to the Commissioner.  (Tr. 109-10) (citing 20 C.F.R. §§404.1527(e) and 416.927(e)).  The ALJ's conclusion in this respect was correct.  *See Soc. Sec. Rul.* 96-5p, 1996 WL 374183, at *2 (July 2, 1996) ("[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance.").

However, Dr. Tolia's August 2010 opinion is a different story.  The ALJ dismissed that opinion on the same basis as the others, noting that Dr. Tolia "opined in a Physical Residual Functional Capacity Assessment dated August 10, 2010, that the claimant was disabled due to her impairments."  (Tr. 109).  While it was proper for the ALJ not to credit Dr. Tolia's ultimate opinion that Amerson was "disabled," he erred by failing to consider and weigh the specific diagnostic findings contained within that opinion.  (Tr. 109-10).  For example, in the August 2010 RFC assessment, Dr. Tolia indicated that Amerson suffered from chronic cervical pain, low back pain, and seizures (among other conditions), and that she experienced back, neck, and leg pain, poor memory, and confusion.  (Tr. 406).  He listed the clinical findings and objective signs that led him to his diagnoses (MRI, EEG, nerve conduction study results, etc.).  (*Id.*).  He then opined as to Amerson's functional limitations, indicating that her symptoms were constantly severe enough to interfere with the attention and concentration needed to perform even simple work tasks.  (Tr. 407).  He added comments such as "patient can't walk!" and "can't sit for long periods of time," and indicated that Amerson needed to use a cane or other assistive device when

engaging in occasional standing/walking.[7]  (Tr. 408).  He opined that her impairments were likely to produce "good days and bad days" and that she would be absent from work as a result of her impairments "more than four days per month."  (Tr. 409).

Although the ALJ gave Dr. Tolia's opinions as a whole "no weight," he did not give *any* reasons – let alone good reasons – for rejecting the specific findings, diagnoses, and opinions set forth in the August 2010 RFC assessment.  (Tr. 109-10).  Moreover, the ALJ did not discuss any of the relevant factors in dismissing Dr. Tolia's findings (such as length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, supportability of the opinion, and specialization of the treating physician).  *See* 20 C.F.R. §416.927(c).  Dr. Tolia is a neurologist, who had been Amerson's treating physician since February 2008.  Amerson saw Dr. Tolia approximately once a month during the relevant time period.  (Tr. 265, 267, 269, 273, 330, 331, 336, 337, 338, 341, 343, 345, 347, 349, 350, 353, 355, 406).  Additionally, Dr. Tolia not only saw Amerson during office visits, but he administered the diagnostic tests that showed abnormalities (the EEG, EMG, and nerve conduction studies).  His opinions are not inconsistent with the record as a whole, as there is not one physician who actually examined Amerson who contradicts his opinions.  Here, where the ALJ failed to give good reasons for rejecting Dr. Tolia's August 2010 medical opinion, his determination that Amerson is not disabled is not supported by substantial evidence.[8]

---

[7] The Commissioner argues that "Dr. Tolia's treatment notes did not support Plaintiff's alleged need for a cane or other physical restrictions."  (Doc. #19 at 18).  This is inaccurate.  For example, on February 11, 2010, Dr. Tolia noted that Amerson's "balance is deteriorating" and that she "uses a walker."  (Tr. 347).  At Amerson's next office visit, on March 11, 2010, Dr. Tolia noted that Amerson "walks with a limp."  (Tr. 345).  Thus, Dr. Tolia's treatment notes do provide support for his medical opinion.

[8] Amerson also argues that the ALJ erred in failing to account for her documented memory problems in formulating her RFC.  (Doc. #15 at 29-31).  Indeed, despite noting that Amerson had "some obvious limitations in calculations and memory," the ALJ declined to include in the RFC

## III.     CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [19] be DENIED, Amerson's Motion for Summary Judgment [15] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that this case be remanded to the ALJ for further proceedings consistent with this Recommendation.

Dated: January 15, 2014                          s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                  United States Magistrate Judge

### NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

---

any limitations in this regard.  (Tr. 106, 110).  Moreover, in considering Amerson's mental impairments, the ALJ mistakenly stated that "at the time of [her] application [for benefits], the record contained no evidence of any mental symptoms."  (Tr. 110).  This is simply not accurate.  (*See, e.g.,* Tr. 269 (noting depression, anxiety and short term memory problems on February14, 2008), 267 (noting moodiness, forgetfulness, and "nerves" on February 28, 2008), 271 (noting that Amerson was "depressed and overwhelmed" on June 4, 2008)).  Accordingly, on remand, the ALJ should take care to properly and thoroughly consider all evidence of Amerson's mental impairments.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 15, 2014.

s/Felicia M. Moses

FELICIA M. MOSES

Case Manager
